## In re J.B., Juvenile

[618 A.2d 1329]

No. 91-223

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed November 6, 1992

*Theresa St. Helaire*, Bennington County Deputy State's Attorney, Bennington, for Appellee.

*David Putter* of *Saxer, Anderson, Wolinsky and Sunshine*, Montpelier, for Appellants.

*Charles S. Martin* and *Robert W. Katims* (On the Brief) of *Martin & Paolini, P.C.*, Barre, for Juvenile.

**Morse, J.** This is an appeal from a decision of the family court denying a motion to reopen an adjudication of delinquency for sexual assault. We hold that J.B. and his parents were given ineffective assistance of counsel when the police sought, and were granted, an interview with J.B. about the allegations of sexual assault. Accordingly, we reverse and remand.

In late June 1990, Officer Brickell of the Manchester Police Department received a report of sexual contact between J.B., who was twelve years old, and two five-year-old boys. Brickell contacted J.B.'s father concerning the investigation and asked to talk with J.B. about it. The father called attorney Gerald Cantini, who had previously served as counsel to J.B.'s parents but had little experience in criminal law, for advice. Right from the outset, Cantini advised J.B.'s parents that they should cooperate with the police, that "it would be very smart to, instead of fighting it, to work within the system and there is nothing to hide."

J.B. and his parents, accompanied by Cantini, met with Officer Brickell at the Manchester Police Department. Upon arrival at the station, Brickell presented them with a "Miranda Warnings and Public Defender Rights Form," from which Brickell

read the juvenile his rights. The form was not explained in particularity by either Cantini or Brickell. Brickell simply read from the form to J.B., waited for verbal responses, and gave no elaboration. Brickell then gave the form to J.B.'s father to read. Although Cantini was present, he did not discuss the form in any detail. He testified: "I didn't go through and explain word for word what the Miranda rights were. I would have assumed that [the father], he was looking at it, was reading it, and if he had had any questions he would have said, 'Gerry, what does this mean, what doesn't it mean.'" Cantini's sole explanation of the Miranda form was that "it is normal, it is procedural, it protects your rights to have counsel, it is very standard." When asked by Brickell whether he understood the Miranda statement, the father asked Cantini, "Should I sign this?" and Cantini responded, "I think it is fine for you to go ahead and sign it." J.B.'s father then signed the Miranda waiver.

Officer Brickell also explained the interview process to J.B. and his parents, and told them that J.B. might speak "without embarrassment" if his parents were not present during the interview. Cantini testified at the motion-to-reopen hearing:

Counsel: [D]id you tell the [B. Family] that if they did not speak to the police that the police might not bring charges?

Cantini: It never came up.

Counsel: [D]id you explain to them . . . the type of pressure that could possibly be put on [J.B] if he were interviewed alone without his attorney or without his parents present?

Cantini: That is an assumption—what pressure? . . . No, I told them that they had the option of being there, of not being there, of me being there, everyone being there. It was up to them.

Cantini summed up by saying that despite the fact that the police would have more evidence against J.B. if he were interviewed, "I advised the [B. Family] to have [J.B.] talk to the police."

During the interview, J.B. did indeed cooperate with the police. Alone in the room with Officer Brickell, J.B. confessed to the delinquent acts that became the basis for the charges against him. The State subsequently charged J.B. with being a delinquent child.

J.B. entered pleas of nolo contendere at a merits hearing in October 1990. In November 1990, at the disposition hearing attended by J.B., Cantini, and J.B.'s parents, as his guardians ad litem, the parties stipulated to the adjudication of delinquency based on the two counts of sexual assault. J.B. was placed on probation, which included the condition that J.B. participate in a "psycho-sexual evaluation . . . and any treatment program which [the facility] might recommend."

In December 1990, the parents, through their second attorney, David Putter, filed a Motion to Reopen the Adjudication of the Merits pursuant to V.R.F.P. 1 and 33 V.S.A. § 5532(a), on the grounds that J.B.'s counsel had ineffectively represented J.B. during the course of the proceedings and that J.B.'s procedural rights had been violated. The crux of the motion was that Cantini had failed to advise appellants against a police interview and of meritorious defenses to the claims against J.B., all of which constituted ineffective assistance of counsel.

At the hearing on the motion, appellants presented testimony by attorney Robert Sheil, Juvenile Defender in the Office of the Defender General. Sheil testified that Cantini should have more aggressively counseled J.B. and his parents about the Miranda waiver and should have advised against allowing J.B. to speak with the police. Sheil concluded that because of this omission, along with several others not pertinent to our decision, Cantini's representation fell short of the standard of that constituting effective assistance of counsel.

The family court concluded that rather than malfeasance, counsel's representation of J.B. involved a deliberate choice of strategy. Further, the court found that no prejudice resulted from Cantini's representation and that, although "unorthodox," it was "effective and beneficial." The motion to reopen was denied. It is from that decision the juvenile and his parents now appeal.

Appellants claim a number of errors, but because we find that counsel did not adequately explain to J.B. and his parents J.B.'s right not to speak with the police and the consequences of a confession, we need not address the others. We hold that Cantini's failure at that stage of the investigation was so unreasonable as to amount to ineffective assistance of counsel and that the family court's contrary assessment was clearly erroneous.

■ The party seeking to establish a claim for ineffective assistance of counsel must show that counsel's representation was below an "objective standard of reasonableness informed by prevailing professional norms." *State v. Bristol*, 159 Vt. 334, 337, 618 A.2d 1290, 1291 (1992); see *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Once that burden is met, the challenging party must show a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bristol*, 159 Vt. at 337, 618 A.2d at 1292 (quoting *Strickland*, 466 U.S. at 694). Our analysis, however, shifts away from the burdens placed on the challenging party where counsel has failed altogether to engage in the adversarial process on behalf of the client. The right to effective assistance of counsel requires "that the accused have 'counsel acting in the role of an advocate.'" *United States v. Cronic*, 466 U.S. 648, 656 (1984) (quoting *Anders v. California*, 386 U.S. 738, 743 (1967)). "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," then the denial of Sixth Amendment rights "makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659. Under such circumstances, no specific showing of prejudice is required.

■ In *In re E.T.C.*, we held:

> [T]he following criteria must be met for a juvenile to voluntarily and intelligently waive his right against self-incrimination and right to counsel under chapter I, article 10 of the Vermont Constitution: (1) he must be given the opportunity to consult with an adult; (2) that adult must be one who is not only genuinely interested in the welfare of the juvenile but completely independent from and disassociated with the prosecution, e.g., a parent, legal guardian, or attorney representing the juvenile; and (3) *the independent interested adult must be informed and be aware of the rights guaranteed to the juvenile.*

141 Vt. 375, 379, 449 A.2d 937, 940 (1982) (emphasis added). As attorney Cantini's testimony shows, he did not provide J.B.'s parents or J.B. any meaningful consultation before waiver of J.B.'s right to remain silent. Although J.B. may have been technically represented by counsel, the record indicates that the

course of compliance set by Cantini could not be considered one which was functionally "independent from and disassociated with the prosecution." *Id.*

In finding that Cantini's advice constituted effective assistance of counsel, the family court determined that Cantini chose to follow a "medical model" rather than a "due process" model. By this, we assume the court meant that Cantini sought to place J.B. in state control to get treatment rather than contest the merits. In the context of juvenile proceedings, however, Cantini's approach was no strategy at all. The police interview, during which the twelve-year-old boy was allowed to face his interrogators unaccompanied by counsel, simply served to arm the prosecution with evidentiary ammunition where it was questionable whether they, prior to the interview, had enough to convict him. The juvenile's well-being before the court was not benefitted by his confession. No plea bargaining took place. As the State said at oral argument, the end result it sought was the same whether J.B. admitted his guilt or contested the delinquency petition. Cantini simply "threw in the towel" and abandoned any strategy to bargain for the best outcome for the juvenile client.

Before J.B.'s confession, the case against him consisted of statements made by two five-year-olds. Cantini failed to consider that the State, without J.B.'s confession, might be willing to settle the matter without litigation. Instead, Cantini expressed his own concerns about litigating because he would have to cross-examine the alleged victims, and stated that "it is not a very nice thing to do because I would have to do my best to break down whatever their allegations or their stories were and I don't think that that would be a very nice thing to do." We may infer, however, that concern about requiring young children to testify would be contemplated by the prosecution also. Without J.B.'s confession, the case against him might have been settled without subjecting the five-year-olds to examination and without subjecting J.B. to the stigma of an adjudication of delinquency. Once J.B. confessed, his bargaining position was greatly undermined. The risks involved were simply not explained to J.B. or his parents. Under the circumstances, J.B.'s confession was the State's strongest evidence.

The family court concluded, based on the testimony of a psychologist who had spent several hours with J.B. and his parents, that J.B. was not prejudiced, had "blossomed" since the adjudication, and that the treatment had a "cathartic" and "rehabilitative" effect. Whether or not the treatment was effective misses the point. The proper inquiry is whether the judicial process retained "its character as a confrontation between adversaries." *Cronic*, 466 U.S. at 657. Counsel's failure to "subject the prosecution's case to meaningful adversarial testing" is a denial of Sixth Amendment rights, and the adversary process becomes "presumptively unreliable." *Id.* at 659. Beyond that, no specific showing of prejudice is required.

We cannot conclude that counsel acted as advocate for J.B. within the parameters of the constitutional guarantee. The posture of the case was significantly affected by Cantini's inadequate advice. If Cantini had engaged in a course of advocacy for his client and challenged the delinquency adjudication, J.B. might still have received the benefits of treatment without the stigma of an adjudication, and may well have "blossomed" as a result. We therefore hold that counsel's representation in this case violated J.B.'s right to effective assistance of counsel.

*Reversed and remanded.*